# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **VERGES ANDERSON, ET AL.**<br>    **Plaintiffs** | **CIVIL ACTION NO. 6:25-cv-01533-DCJ-CBW** |
| **v.** | **JUDGE ROBERT R. SUMMERHAYS** |
| **NEW DAY PERSONAL CARE**<br>**SERVICES, INC.,**<br>    **Defendant** | **MAGISTRATE JUDGE DAVID J. AYO** |


## OPPOSITION TO PLAINTIFFS' MOTION FOR COLLECTIVE CERTIFICATION

# TABLE OF CONTENTS

PAGE

I.      FACTUAL AND PROCEDURAL BACKGROUND                            2

    A.  Procedural Status                                         2

    B.  Defendant's Business Operations and Dissimilarities      3
        Between Contractors

II.     PLAINTIFFS' REQUEST FOR CERTIFICATION OF A                   8
    COLLECTIVE IS PREMATURE

    A.  Motion to Stay Pending                                    8

    B.  Discovery Needed Under *Swales*                           8

III.    PLAINTIFFS HAVE NOT MET THE STANDARD FOR                     11
    CERTIFICATION AND NOTICE UNDER *SWALES*

    A.  Plaintiffs Have Failed to Establish That They and All     11
        Potential Opt-In Plaintiffs are Similarly Situated

    B.  Plaintiffs' Reliance on Pre-*Swales* Cases is Misplaced    16

IV.     PLAINTIFFS' REQUEST FOR NOTICE IS IMPROPER                   17

V.      CONCLUSION                                                   19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. New Day Personal Care Services, Inc.* ..................................................................................3
    Case No. 6:25-cv-01533 (W.D. La.)

*Behnken v. Luminant Min. Co., LLC*,
    997 F.Supp.2d 511 (N.D. Tex. 2014) .................................................................................... 18

*Garcia v. TWC Admin., LLC*,
    2015 WL 1737932 (W.D. Tex. San Antonio Div. 2015).......................................................18

*Graham v. Jet Specialty, Inc.*,
    2016 WL 154846 (W.D. Tex. 2016)......................................................................................18

*Hopkins v. Cornerstone America*,
    545 F.3d 338 (5th Cir. 2008) ................................................................................................13

*Lusardi v. Xerox Corp.*,
    118 F.R.D. 351 (D.N.J. 1987) ..................................................................................9, 10, 11, 12

*New Day v. Chavez-Deremer*,
    Case No. 6:25-cv-00075 (W.D. La) .......................................................................................3

*Nguyen v. Versacom, LLC*,
    2015 WL 1400564 (N.D. Tex. 2015) .....................................................................................18

*Swales v. KLLM Transport Servs, L.L.C.*,
    985 F.3d 430 (5th Cir. 2021)……………………………………………………1, 9, 10, 11, 12, 16, 17, 19

*Willis v. New Day Personal Care Services, Inc.* .....................................................................................3
    Case No. 6:25-cv-01424 (W.D. La.)

**Statutes**

29 U.S.C. § 213(a)(15) .............................................................................................................2

Fair Labor Standards Act.........................................................................................................1

**Other Authorities**

40 Fed. Reg. 7,404 (Feb. 20, 1975) .........................................................................................2

78 Fed. Reg. 60,454, 60,557 (Oct. 1, 2013) (codified at 29 C.F.R. § 552.109).........................3

Rules of Prof. Conduct, Rule 7.4 .............................................................................................20

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **VERGES ANDERSON, ET AL.** | **CIVIL ACTION NO. 6:25-cv-01533-DCJ-CBW** |
|     **Plaintiffs** | |
| **v.** | **JUDGE ROBERT R. SUMMERHAYS** |
| | |
| **NEW DAY PERSONAL CARE** | **MAGISTRATE JUDGE DAVID J. AYO** |
| **SERVICES, INC.,** | |
|     **Defendant** | |

### OPPOSITION TO PLAINTIFFS' MOTION FOR COLLECTIVE CERTIFICATION

Defendant New Day Personal Care Services, Inc. ("New Day") submits this Opposition to Plaintiff's Motion for Collective Certification [Rec. Doc. 23]. Plaintiffs have moved for certification of a collective action despite a pending motion by New Day to stay the case [Rec. Doc. 15] the Department of Labor's rulemaking process with respect to an FLSA overtime exemption governing home care workers is completed. The finalized DOL rule will likely moot the Plaintiff's claims in this case by restoring decades of prior DOL interpretation (from at least 1975 through 2013) under which home care workers are exempt from the minimum wage and overtime requirements of the FLSA.

Plaintiff's motion also flies in the teeth of a clear directive from the Fifth Circuit that this collective action certification process cannot proceed without sufficient discovery to determine whether the members of the proposed class are similarly situated individuals. In 2021, the Fifth Circuit significantly changed the landscape and standards for Fair Labor Standards Act ("FLSA") collective action notice and certification in *Swales v. KLLM Transport Servs, L.L.C.*[1] Under *Swales*, district courts must rigorously enforce the similarly situated requirement at the outset of litigation and should require discovery prior to certifying any collective or issuing

---

[1] 985 F.3d 430 (5th Cir. 2021).

notice to potential opt-in plaintiffs. Here, no discovery has taken place, and it would be highly prejudicial for discovery to proceed until such time as the DOL rulemaking process is completed. Otherwise, New Day will be subjected to substantial litigation expenses that may be completely unnecessary once the final rule is issued. Such harm would be irreparable, as New Day would have no way to recover thousands of dollars in litigation costs that the discovery process in this case will certainly entail. For these reasons, and because the attached Declaration of Robert Doucet demonstrates that the home care workers are not similarly situated, the Plaintiffs' premature Motion for Collective Action Certification should be denied.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedural Status

As this Court is aware, this case is among three currently pending in the Western District of Louisiana all involving the Department of Labor's ("DOL") shifting rules regarding the interpretation of the FLSA's exemption for employees employed to provide companionship services. A full history of this rule is presented in New Day's pending Motion to Stay, so New Day will only include a brief recap here.[2]

From at least 1975 to 2013, the DOL operated under its rule that the companionship services exemption in the FLSA was applied to employees of home-care agencies providing companionship services.[3]  In 2013, the DOL promulgated a "pen-and-phone" rule which abandoned the longstanding 1975 rule and instituted a rule under which home-care agencies, such as New Day, "may not avail themselves" of the companionship services exemption unless they are members of the same family or household as the individual receiving the services. 78 Fed. Reg. 60,454, 60,557 (Oct. 1, 2013) (codified at 29 C.F.R. § 552.109).

---

[2] Rec. Doc. 15-1.
[3] *See* 29 U.S.C. § 213(a)(15); 40 Fed. Reg. 7,404 (Feb. 20, 1975).

In January 2025, New Day brought a pre-enforcement action challenging the DOL's 2013 rule. *New Day v. Chavez-Deremer*, Case No. 6:25-cv-00075 (W.D. La). In July 2025, during the pendency of New Day's pre-enforcement action, the DOL issued a proposed rule that would restore the 1975 rule. Accordingly, this Court issued an Order staying the *New Day v. Chavez-Deremer* matter pending the ongoing rulemaking.

While the *New Day v. Chavez-Deremer* matter was pending, two additional cases, including this one, were filed against New Day, both related to the companionship exemption and New Day's classification of companionship workers. *See Anderson v. New Day Personal Care Services, Inc.*, USDC WDLA No. 6:25-cv-1533; *Willis v. New Day Personal Care Services, Inc.*, USDC WDLA No. 6:25-cv-1424. Because this case was related to the lower numbered *Willis* matter, it was reassigned and accordingly all three matters are now pending before the Honorable Judge Summerhays.

### B. Defendant's Business Operation and Dissimilarities Between Contractors

New Day is licensed as a Home and Community Based Service ("HCBS") provider through the Louisiana Department of Health and is a Medicaid-enrolled provider.[4] HCBS licensure is required to perform home care services of the type performed by New Day's providers in Louisiana.[5] In other words, individuals cannot work as home care service providers without obtaining such licensure individually or associating with a company, like New Day, that has such licensure.[6]

A majority of New Day's home care workers approach the Company on behalf of clients with whom the individuals already have a relationship but for whom they could not provide Medicaid-reimbursed home care services without either obtaining an HCBS license or

---

[4] Exhibit "A," Declaration of Robert Doucet ¶¶ 5-6.
[5] Exhibit "A," Declaration of Robert Doucet ¶ 18.

associating with a company like New Day.[7] In these scenarios, New Day engages these individuals to provide care services specifically for the home care worker's pre-chosen clientele. These workers often switch between HCBS-licensed home care agencies and, when they do so, bring the clients they are servicing with them to the new agency.[8] When the care of those clients ends, often so too does the care provider's relationship with New Day.[9] This is true of at least two of the named Plaintiffs, Verges Anderson and Latonia Alfred.[10]

The minority of home care workers who do not bring clients with them to New Day are not "assigned" clients by New Day. Instead, home care workers are free to select home care work assignments posted by New Day, are not required to work on any specific number of home care assignments, and a free to discontinue providing home care services to a given client.[11]

Additionally, as a Medicaid-enrolled provider, New Day is subject to Medicaid-mandated compliance.[12] For example, each of New Day's individual clients must have a specific and detailed care plan, the substance of which is dictated client authorization levels and state regulatory requirements.[13] As a result of these requirements, the care plans created by New Day do not reflect employer control over its workforce. Rather, they result from New Day's regulatory compliance and Medicaid mandates.[14]

Further, while the individual needs of each client as well as Medicaid authorizations results in different care plans for each client, the order and specific manner in which the home care worker provides companionship and assistance to clients is largely left to the discretion of

---

[6] Exhibit "A," Declaration of Robert Doucet ¶ 18.
[7] Exhibit "A," Declaration of Robert Doucet ¶ 14.
[8] Exhibit "A," Declaration of Robert Doucet ¶ 19.
[9] Exhibit "A," Declaration of Robert Doucet ¶ 20.
[10] Exhibit "A," Declaration of Rober t Doucet¶ 15.
[11] Exhibit "A," Declaration of Robert Doucet ¶ 16.
[12] Exhibit "A," Declaration of Robert Doucet ¶¶ 26-27.
[13] Exhibit "A," Declaration of Robert Doucet ¶ 26.
[14] Exhibit "A," Declaration of Robert Doucet ¶ 27.

the worker in concert with the client they are assisting.[15] New Day does not have supervisors who direct and control the details of the home care work. Rather, New Day case managers ensure that the care plan dictated by Medicaid rules and scale systems are being met for each client.[16]

New Day does not provide any tools or equipment to the home care workers, and the home care workers are responsible for their own transportation to the client's home, and also use their personal automobiles to transport clients during their assignment. The home care workers are solely responsible for these vehicle costs (including the cost of maintaining required automobile insurance coverage) and are not reimbursed by New Day for these expenses. Home care workers are also responsible for having their own cellphone in order to facilitate communication with the client and New Day should unanticipated circumstances prevent them from providing the companionship services required by the client's Medicaid approved in-home care schedule.[17] Home care workers are not paid for time spent commuting to and from the homes of their clients, and therefore the profitability of their work is affected by what assignments the home care worker choses to select relative to the location of their home.[18]

New Day does not track the time spent by home care workers providing their services. Instead, Medicaid also requires the homecare worker to log in through an EVV (electronic visit verification), provided by a third-party provider company called Statistical Resources, in order to clock in and out each day from the client's home. This to prevent overlapping services that the home care worker might be providing through a different provider company.[19]

---

[15] Exhibit "A," Declaration of Robert Doucet ¶ 11.
[16] Exhibit "A," Declaration of Robert Doucet ¶ 11.
[17] Exhibit "A," Declaration of Robert Doucet ¶ 12.
[18] Exhibit "A," Declaration of Robert Doucet ¶ 12.
[19] Exhibit "A," Declaration of Robert Doucet ¶ 13.

New Day, as a licensed home care provider, is required to have policies and procedures governing the care provided by its home care workers, including dictates regarding the kinds of activities that a home care worker can and cannot do.[20]  However, these requirements are not determined in the discretion and business judgment of New Day, but are instead dictated by statutes and regulations of Medicaid and the Louisiana Department of Health.[21]  New Day merely implements these legal requirements through its policies and procedures as a licensed HCBS provider and flows these down to the home care workers.[22]

Finally, the rates paid by New Day to its workers are largely dictated by Medicaid.  New Day provides the home care services to the client and submits its requests for payment directly to the Medicaid programs.[23] New Day submits these payment requests through the Louisiana Department of Health's system called LASRS, a software developed by Statistical Resources. Payments are processed through a third-party company called Gainwell Technologies.[24]  New Day does not establish pricing for the clients with respect to the home care services provided. Instead, these services are reimbursed by Medicaid at established hourly reimbursement rates that do not include any overtime premium based on the number of hours of home care services provided.[25]

Effective October 1, 2024, the maximum hourly home care provider reimbursement is $18.52 per hour.[26]  Prior to October 1, 2024, the reimbursement rate for 24-hour care was only $13.52 per hour for care provided to clients during the hours of 10 p.m. to 6 a.m.[27] The difference between what New Day receives as its reimbursement rate from the Medicaid

---

[20] Exhibit "A," Declaration of Robert Doucet ¶ 27.
[21] Exhibit "A," Declaration of Robert Doucet ¶ 27.
[22] Exhibit "A," Declaration of Robert Doucet ¶ 27.
[23] Exhibit "A," Declaration of Robert Doucet ¶ 28.
[24] Exhibit "A," Declaration of Robert Doucet ¶ 28.
[25] Exhibit "A," Declaration of Robert Doucet ¶ 29.
[26] Exhibit "A," Declaration of Robert Doucet ¶ 31.

program and what it pays to the home care providers is the margin available to cover the Company's rising overhead and operating expenses (including the cost of processing reimbursements through the Medicaid system, which individual home care providers cannot do), as well as a very small profit margin.[28]

Because nearly all of these Medicaid reimbursements received by New Day are paid out to the home care workers and needed to pay the fixed costs of doing business, profit margins are very small, and because rates are fixed by the Medicaid program rates, neither New Day nor its home care workers have any opportunity to increase the profitability of this home care work.[29] However, home care workers can, and many do, supplement their earnings by combining their home care work with other work during the downtime periods of their home care work through New Day.[30] They can also maximize the profitability of their work by choosing home care work assignments located near their home (or other places nearby other places they need to be – near a college campus, the location of an outside employer or other home care assignment they might undertake, or their child's school) in order to minimize their travel time and expenses.[31]

## II. PLAINTIFFS' REQUEST FOR CERTIFICATION OF A COLLECTIVE IS PREMATURE

### A. Motion to Stay Pending

As noted above, in July 2025, the DOL issued a proposed rule that would restore decades of interpretation of the companionship services exemption and would make Plaintiffs here (as well as in the *Willis* matter) exempt from the minimum wage and overtime requirements of the FLSA. In other words, even if New Day was considered an "employer" for purposes of the

---

[27] Exhibit "A," Declaration of Robert Doucet ¶ 31.
[28] Exhibit "A," Declaration of Robert Doucet ¶ 32.
[29] Exhibit "A," Declaration of Robert Doucet ¶ 33.
[30] Exhibit "A," Declaration of Robert Doucet ¶¶ 10, 34.
[31] Exhibit "A," Declaration of Robert Doucet ¶ 34.

FLSA (which New Day denies) the proposed rule would require summary judgment in New Day's favor.

To conserve the resources of the parties and of this Court, on December 19, 2025, New Day filed a motion with this Court seeking to stay this litigation pending the completion or abandonment of the 2025 proposed rule.[32] Disregarding all considerations of judicial economy, following New Day's Motion to Stay, Plaintiffs filed their instant motion seeking collective certification. Simply put, the consideration of a potential collective for this matter should be deferred until this Court and the parties can consider the scope of any potential collective based on the applicable DOL rule. Certifying any collective prior to the finalization of the relevant rule is clearly premature, and puts the cart before the horse.

### B. Discovery Needed Under *Swales*

Plaintiffs' request for collective certification is also premature because there has been no discovery conducted in this case. In January 2021, the U.S. Fifth Circuit issued a ruling that dramatically changed the landscape for FLSA collective actions and rejected the conditional certification method followed by many courts. In *Swales v. KLLM Transport Servs, L.L.C.*, the Fifth Circuit conducted an extensive analysis of the purpose of FLSA collective actions and the method in which they should proceed.[33] The court for the first time addressed "[h]ow rigorously, and how promptly, should a district court probe whether potential members are 'similarly situated' and thus entitled to court-approved notice of a pending collective action?"[34] It resolved that district courts should "rigorously enforce" the similarly situated requirement at the outset of

---

[32] Rec. Doc. 15.
[33] 985 F.3d 430 (5th Cir. 2021).
[34] *Id*. at 433.

the litigation and should require discovery early to assist in determining whether potential opt-in plaintiffs are similarly situated to the named plaintiff.[35]

Prior to *Swales*, many courts applied the *Lusardi* test, a two-step "conditional certification" method for certifying a collective under the FLSA.[36]  Under *Lusardi*, step one involves "an initial 'notice stage' determination that proposed members of a collective are similar enough to receive notice of the pending action."[37]  This step is referred to as "conditional certification" of a putative class, and was typically based on the pleadings and affidavits of the parties.[38]  Often, for the conditional certification stage, district courts required little more than substantial allegations that the putative collective members were all victims of a single decision, policy, or plan.[39]

Step two under *Lusardi* occurred at the conclusion of discovery, often prompted by a motion by the defendant to decertify the class.[40]  At this stage, because the court had the benefit of full discovery, it would then make a second and final determination, using a stricter standard, about whether the named plaintiffs and opt-ins were similarly situated and thus could proceed to trial as a collective.[41]  If the opt-ins were not sufficiently similar, they would be dismissed at this stage.[42]  Factors courts considered at the second stage included (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.[43]

---

[35] *Id*. at 443.
[36] *Id*. at 434; *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).
[37] *Swales*, 985 F.3d at 436 (internal quotations omitted).
[38] *Id*.
[39] *Id*.
[40] *Id*.
[41] *Id*. at 437.
[42] *Id*.
[43] *Id*.

In *Swales*, the U.S. Fifth Circuit rejected the *Lusardi* test and the entire concept of "conditional certification." Instead, the court set out a "workable, gatekeeping framework for assessing at the outset of the litigation, *before* notice is sent to potential opt-ins, whether putative plaintiffs are similarly situated—not abstractly but actually."[44] Under this framework, district courts "must rigorously scrutinize the realm of 'similarly situated' workers, and must do so from the outset of the case, not after a lenient, step-one 'conditional certification.'"[45] The court noted that the idea of a conditional certification has no basis in the text of the FLSA.[46] Rather, the FLSA says that the district court's job is ensuring that notice goes out to those who are "similarly situated" while scrupulously avoiding endorsing the merits of the case.[47]

In setting out its new framework, the Fifth Circuit expressly endorsed conducting discovery <u>before</u> authorizing any notice to potential opt-in plaintiffs. The court stated that "a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated'" and then "<u>should authorize preliminary discovery accordingly</u>."[48] The court was clear that at least some discovery is necessary to resolve the similarly situated question, and the district court must decide the "amount of discovery needed to determine if and when to send notice to potential opt-in plaintiffs."[49]

### III. PLAINTIFFS HAVE NOT MET THE STANDARD FOR CERTIFICATION AND NOTICE UNDER *SWALES*

#### A. Plaintiffs Have Failed to Establish That They and All Potential Opt-In Plaintiffs are Similarly Situated

---

[44] *Id*. at 433 (emphasis in original).
[45] *Id*. at 434.
[46] *Id*. at 440.
[47] *Id*.
[48] *Id*. at 441 (emphasis added).
[49] *Id*. at 441.

Plaintiffs' request for certification in this matter is entirely premature as there has been none of the discovery required under *Swales*. Instead, Plaintiffs' have done exactly what *Swales* says they cannot; they have moved for certification based only on the generalized affidavits of a few named Plaintiffs. In fact, Plaintiffs' request for certification of a collective at this stage is even more egregious than the conditional certification previously allowed under *Lusardi*, because Plaintiffs do not contemplate <u>ever</u> conducting discovery into whether they and the potential opt-in plaintiffs are similarly situated. Rather, Plaintiffs are requesting that this Court certify a class for the entirety of the case, based only on Plaintiffs' unsubstantiated allegation that they believe they are similarly situated to New Day's other independent contractors. This simply is not sufficient. Further, the Plaintiff's conclusory allegations are refuted by Mr. Doucet's Declaration.

In *Swales*, the plaintiffs were truck drivers who alleged that they were misclassified as independent contractors.[50] The plaintiffs claimed all truck drivers were similarly situated because they had been misclassified and thus not paid appropriate wages.

After setting out its requirement for early discovery on the issue of whether potential plaintiffs are similarly situated, the *Swales* court stated that the *Lusardi* test for conditional certification was particularly inappropriate in a case alleging misclassification as independent contractors because the threshold issue depended on the economic-realities test, which asks how much control the employer had over the independent contractor.[51] The district court needed to consider all available evidence to determine if the economic-realities test could even be applied on an collective basis, or if the proposed plaintiff's circumstances would make such a collective

---

[50] *Id.*
[51] *Id.* at 442.

action unwieldy.[52]  The court expressly noted that "the individualized nature of the economic-realities test is why misclassification cases rarely make it to trial on a collective basis."[53]

In *Swales*, the court noted that in misclassification cases "the threshold issue [i.e., the determination of whether an individual is properly classified as an independent contractor or an employee] depends on the economic-realities test, which asks how much control the employer had over the independent contractor."[54]  The Fifth Circuit noted the considerable difficulty of applying the economic-realities test on a collective basis:

> Thus, the district court needed to consider the evidence relating to this threshold question in order to determine whether the economic-realities test could be applied on a collective basis.  If answering this question requires a highly individualized inquiry into each potential opt-in's circumstances, the collective action would quickly devolve into a cacophony of individual actions.  **As [defendant] points out, the individualized nature of the economic-realities test is why misclassification cases rarely make it to trial on a collective basis.**[55]

As in *Swales*, Plaintiffs' action here is based on their allegation that they were improperly classified by New Day as independent contractors rather than employees.  New Day denies Plaintiffs' allegations and contends it has always classified its workers correctly.  As noted in *Swales*, the nature of this dispute makes it particularly inappropriate for a collective action and particularly critical to conduct discovery prior to any notice or collective certification can proceed.

As detailed above, this matter involves workers with significantly different work situations, which defeats Plaintiffs' claim that all are similarly situated.  Additionally, these differences make it such that the central questions in determining FLSA liability here –whether the home care providers contracted by New Day are properly classified as independent

---

[52] *Id.*
[53] *Id.*
[54] *Id.* at 442 (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998).

contractors or employees, and also whether the providers are exempt from the minimum wage and overtime requirements of the FLSA – cannot be answered in the collective. The economic-realities test focuses on the level of control exercised by the alleged employer over the workers. Courts typically consider the following non-exhaustive factors in this test: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship.[56]

While the ultimate merits question is not required to be answered at this stage, the Court must consider whether the test can be analyzed on a collective basis. As evidenced by the varied work situations of New Day's home care providers, it cannot. One of the most significant differences between New Day's home care providers is the manner in which they come to work for New Day. As discussed above, and as detailed in the Declaration of Robert Doucet, many, indeed a majority, of New Day's care providers approach New Day with their own clientele for whom they wish to provide services. These home care workers, who have their own clients that they bring to New Day, are clearly not economically dependent on New Day, in that they are not dependent on New Day for home care work assignments. And even those home care workers who do not bring their own clients are not "assigned" clients by New Day. Instead, home care workers are free to choose which, and how many home care clients they will work with, and for how long. These scheduling issues are decided by the home care workers, not New Day.

Mr. Doucet's declaration also makes clear that the individual needs of each client as well as Medicaid authorizations result in different care plans for each client, and the order and manner

---

[55] *Id.* (emphasis added).
[56] *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008).

in which the home care worker provides companionship and assistance to clients is largely left to the discretion of the worker in concert with the client they are assisting. New Day does not direct or supervise these daily home care activities. Accordingly, the work of these individuals involves their exercise of discretion while working in the client's home. Other factors addressed in Mr. Doucet's declaration also weigh against a finding of misclassification – including the fact that New Day does not provide any tools or equipment to the home care workers, that they are responsible for the cost of their own transportation and cell phones needed to provide the home care services. The fact that New Day has policies and procedures governing the home care work is not indicative of New Day exercising control over these workers, but is instead simply a flow down of state and federal rules and regulations governing the provision of these home care services.

Finally, the rates paid by New Day to its workers are largely dictated by Medicaid, and neither party to the relationship can set the client rates. Instead, the home care workers' opportunity for profit is determined by their entrepreneurial judgments, including the client assignments they chose to perform relative, the location of those work assignment relative to the location of their home (or other places a home care worker may otherwise need to be) and the home care worker's decision whether to use their down time during home care assignments to engage in other work activities.

Further, even if Plaintiffs could establish that they are similarly situated for purposes of the alleged misclassification (they cannot), they must still also establish that they are similarly situated for purposes of determining whether the home care worker exemption applies to them. Under the proposed rule, which would return to the 1975 interpretation of the statutory home care worker exemption, home care providers can perform some housework for the client, as long

as that work is related to the client's care. New Day contends that any housework performed by any of its care providers must be related to the clients' care. But, if any of the Plaintiffs (or potential opt-in plaintiffs) intend to argue that any of the housework they perform is unrelated to client care, and that they are not exempt for this reason, this would be an additional factual issue that cannot be evaluated on a class-wide basis.

In arguing that Plaintiffs and the potential opt-ins are similarly situated, Plaintiffs essentially claim that this is true because each individual worked for New Day, was classified as an independent contractor, had to follow New Day's instructions to complete their job, and was paid an hourly rate (and no overtime). These conclusory allegations fall woefully short of the requirements to show similarly situated workers in this context. And, as can be seen from the Declaration of Robert Doucet, Plaintiffs' unsubstantiated allegations of similarity simply do not hold up to the facts of this case, and are heavily disputed by New Day. Additionally, because of the different work scenarios of New Day's care providers, the economic reality question simply cannot be answered in the collective.

### B.  Plaintiffs' Reliance on Pre-*Swales* Cases is Misplaced

In arguing that the Court should certify a class at this early stage and issue notice to the alleged similarly situated workers, Plaintiffs claim that the New Day workers' "employment status is a merits-based analysis and is premature at this stage."[57]  In support of this argument, Plaintiffs rely on numerous pre-*Swales* cases that are simply inapplicable given the procedural stage of this case and the changes to the certification process delineated in *Swales*.

---

[57] Rec. Doc. 23-1, p. 14.

For example, Plaintiffs argue that "Courts regularly recognize that there is an inadequate record at the certification stage to apply economic realities factors and these factors go to the ultimate issues, not whether notice should issue under the lenient similarly-situated analysis."[58] But the cases cited for that proposition are from district court decisions issued <u>before *Swales*</u> in cases applying the *Lusardi t*wo-step process for early conditional certification, with a later strict review under which a collective could be decertified.[59]  Critically, in all of the few post-*Swales* cases cited by Plaintiffs, the records show that discovery was conducted <u>before</u> the motions for class certification were filed.[60]  Those cases simply do not support Plaintiffs' request for collective certification here, in the absence of any discovery.

Plaintiffs' argument that the Court should not give any consideration to the question of Plaintiffs' status as employees or independent contractors is simply contrary to the directive in *Swales*, where the Court expressly stated that a "district court need[s] to consider the evidence relating to this threshold question in order to determine whether the economic-realities test could be applied on a collective basis.  If answering this question requires a highly individualized inquiry into each potential opt-in's circumstances, the collective action would quickly devolve into a cacophony of individual actions."[61]  As the court stated, "the individualized nature of the economic-realities test is why misclassification cases rarely make it to trial on a collective basis.[62]

IV.    **PLAINTIFFS' REQUEST FOR NOTICE IS IMPROPER**

In addition to the fact that this matter is not ripe for consideration of collective certification, Plaintiff's proposed notice is inappropriate.  As an initial matter, the Plaintiffs'

---

[58] Rec. Doc. 23-1, p. 14.
[59] *See* Rec. Doc. 23-1, p. 14-17.
[60] *See* Rec. Doc. 23-1, p. 18, n. 7.
[61] *Swales*, 985 F.3d at 442.

proposed notice is not even limited to the individuals that they claim are "similarly situated," i.e., those allegedly classified by New Day as independent contractors. Rather, Plaintiffs' proposed notice would be sent to "all home care workers currently or formerly employed by, or working on behalf of, New Day . . . ."

Additionally, Plaintiffs' notice fails to advise the potential opt-in recipients of any of the obligations they may have as a result of joining the potential collective. For example, the proposed notice lacks any information regarding the obligations of litigants to respond to written discovery, to appear for a deposition, and to testify at trial. This information is needed to fully inform the potential opt-in plaintiffs of the ramifications of joining the litigation. Without this language, a potential opt in plaintiff will be led to believe that their participation in the case begins and ends with the signing and mailing of the opt-in consent form – which is incorrect. A number of courts considering the issue have held that an opt-in notice should contain these kinds of provisions.

In *Behnken v. Luminant Min. Co., LLC*, 997 F.Supp.2d 511, 524 (N.D. Tex. 2014), the court modified the class notice to include language that "individuals joining the lawsuit may be required to give a deposition, respond to written discovery, and testify in court." Likewise, in *Garcia v. TWC Admin., LLC*, 2015 WL 1737932, *7 (W.D. Tex. San Antonio Div. 2015), the court required the notice to include an advisory to potential plaintiffs regarding their potential discovery obligations, including that they may be required to participate in discovery and may be required to travel to San Antonio to fulfill that obligation. *Graham v. Jet Specialty, Inc.*, 2016 WL 154846, *7 (W.D. Tex. 2016) similarly required the opt-in notice to inform plaintiffs of their potential obligations as party to the suit, including a requirement to participate in discovery and sit for a deposition. Finally, in *Nguyen v. Versacom, LLC*, 2015 WL 1400564 (N.D. Tex. 2015)

---

[62] *Id.*

the district court noted that courts routinely approve language in opt-in notices advising plaintiffs that they may be required to give a deposition, respond to written discovery, and testify at trial. Such language was ordered by the court in that case.

Additionally, any notice should advise potential plaintiffs that if they do not prevail, they may be responsible for Defendants' costs and expenses. *See Garcia*, 2015 WL 1737932, *7; *Behnken*, 997 F.Supp.2d at 524. Any potential benefit of participating in this litigation may be outweighed by the inconvenience of time spent responding to written discovery, having to miss work or school to appear for a deposition or arrange for childcare in order to testify at trial– which litigation participation time and personal expense is not compensable. Including these statements in any notice is necessary to permit the potential opt in plaintiffs the opportunity to make an informed decision about whether (or not) joining the litigation is in their individual best interests.

Finally, in their exhibits, Plaintiffs include a proposed telephone script to provide notice to potential opt-in plaintiffs. This method of communication is inappropriate as there is no mechanism to ensure that only approved content is conveyed to the recipient – for example, how a caller is to handle questions that may be asked. This apparent proposal to cold-call potential plaintiffs is akin to unrestrained solicitation (which is prohibited by the Louisiana Rules of Professional Conduct[63]) and should not be permitted. The Plaintiffs have failed to explain why telephone contact with potential opt in Plaintiffs is necessary, when mailing, emailing and/or texting copies a court-approved notice would clearly suffice. Plaintiffs have not provided this Court with any case law in which this notice format has been used. In any case, if this Court

---

[63] *See* State Bar Articles of Incorporation, Art. 14, Rules of Prof. Conduct, Rule 7.4 (prohibiting solicitation of a prospective client by in person or telephone contact).

approves notice being sent at any point in this litigation, that notice should not include telephone calls to potential collective members.

## V.    CONCLUSION

Plaintiffs' request for collective certification and issuance of notice at this early stage of the litigation, before any discovery has been conducted, violates the Fifth Circuit mandates from *Swales*. Should the Court nonetheless take up the collection action certification at this time (even with no discovery completed – in conflict with *Swales*), the detailed declaration provided by Mr. Doucet makes clear that the required showing that the Plaintiffs and the potential opt in class are similarly situated has not been made. For these reasons, the Plaintiffs' request for certification should be denied and this matter should be stayed until the Department of Labor issues its final rule regarding the home care provider exemption under the FLSA.

Respectfully submitted,

*s/ David M. Whitaker*
**DAVID M. WHITAKER (#21149)**
**ZOE W. VERMEULEN (#34804)**
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
Facsimile: (504) 585-3051
E-mail: david.whitaker@keanmiller.com
        zoe.vermeulen@keanmiller.com
Counsel for New Day Personal Care Services, Inc.